IN the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
Joseph P. PRELOZNIK, Attorney at Law.

Supreme Court

*No. 91-0232-D. Submitted on briefs May 28, 1992.—Decided
June 22, 1992.*

(Also reported in 485 N.W.2d 249.)

PER CURIAM. *Attorney disciplinary proceeding;
public reprimand imposed.*

For Joseph F. Preloznik there were briefs filed by
*Daniel W. Hildebrand* and *Ross & Stevens, S.C.,*
Madison.

For the Board of Attorneys Professional Responsibility there were briefs by *Michael S. Weiden* and
*Quarles & Brady,* Madison.

The Board of Attorneys Professional Responsibility (Board) appealed and the respondent, Attorney Joseph F. Preloznik, cross-appealed from the referee's conclusions of law in respect to professional misconduct and his recommendation for discipline and for the assessment of costs of this disciplinary proceeding. The Board appealed from the referee's conclusion that it failed to establish by clear and convincing evidence that Attorney Preloznik engaged in conduct involving dishonesty, fraud, deceit or misrepresentation by obtaining $15,000 from an investor in his client's project as advanced expenses for a trip he and his client's board members were taking and using that money to reimburse himself for payments of his own funds he had made to two members of his client's board of directors. Attorney Preloznik cross-appealed from the referee's conclusion that he entered into a conflicting business transaction with a client by paying $18,000 of his own funds to the two members of his client's board as advances on expenses without the client's prior knowledge and consent.

Neither party appealed from the referee's conclusion that the Board failed to establish by clear and convincing evidence that Attorney Preloznik had engaged in professional misconduct in two other counts of the Board's complaint. The Board dismissed a fifth count of professional misconduct at the outset of the disciplinary hearing.

Both the Board and Attorney Preloznik contest the referee's recommendation that the court publicly reprimand him as discipline for the professional misconduct he engaged in by advancing his own funds to members of his client's board of directors without its knowledge and consent. Further, the Board appealed from the referee's recommendation that Attorney Preloznik be assessed less than the full costs of the disciplinary proceeding for

138

the reason that a substantial portion of the costs are attributable to the four causes of action in the Board's complaint in which the Board did not establish that Attorney Preloznik engaged in professional misconduct.

Neither the Board nor Attorney Preloznik contested the referee's findings of fact and, as they are not clearly erroneous, we adopt those findings. We also adopt the referee's conclusions of law based on those facts. Thus, we adopt the referee's conclusion that Attorney Preloznik entered into a business transaction with a client in which they had differing interests without the client's consent after full disclosure, in violation of SCR 20.27(1).[1] We also adopt the referee's conclusion that Attorney Preloznik did not engage in conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of SCR 20.04,[2] by using funds he had sought and

---

[1]As the conduct at issue in this proceeding occurred prior to 1988, the effective date of the current Rules of Professional Conduct for Attorneys, SCR chapter 20, references to the disciplinary rules are to the former Code of Professional Responsibility, SCR chapter 20 (1986).

SCR 20.27 provided:

> **Limiting business relations with a client.** (1) A lawyer may not enter into a business transaction with a client if they have differing interests in that transaction and if the client expects the lawyer to exercise his or her professional judgment in the transaction for the protection of the client, unless the client has consented after full disclosure.

The current rule proscribing such conduct is SCR 20:1.8.

[2]SCR 20.04 provided:

> **Misconduct.** A lawyer shall not:
> (1) Violate a disciplinary rule or the attorney's oath.
> (2) Circumvent a disciplinary rule through actions of another.
> (3) Engage in illegal conduct involving moral turpitude.
> (4) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

obtained for payment of expenses of a trip he and others were to take on his client's behalf to reimburse himself for the payments of his own funds he had made to two members of his client's board of directors.

We determine that a public reprimand is appropriate discipline for Attorney Preloznik's professional misconduct. While his payment of his own funds to two members of his client's board of directors without the board's knowledge or consent created a potential for a conflict between Attorney Preloznik's own interests and those of his client, the fact that the board of directors subsequently ratified those payments as legitimate business expenses and the lack of any evidence that Attorney Preloznik's own interests actually came in conflict with those of his client attenuate the seriousness of the misconduct. We do not accept, however, the referee's recommendation that we assess less than the full costs of this disciplinary proceeding against Attorney Preloznik. With the exception of the costs incurred by the Board in this appeal and cross-appeal, as discussed below, we hold Attorney Preloznik to the payment of the full costs incurred by the Board in this proceeding.

Attorney Preloznik was admitted to practice law in Wisconsin in 1962 and practices in Madison. He has not previously been the subject of a disciplinary proceeding. Following a disciplinary hearing, the referee, Attorney Rudolph P. Regez, made findings of fact as follows.

Beginning in October, 1985, Attorney Preloznik was retained to represent Indian Community School, Inc. (ICS), originally founded in 1970 as an alternative school for the growing Indian population in Milwaukee. He was initially retained to obtain a deed from the city of Mil-

The current rule proscribing such conduct is SCR 20:8.4.

waukee to the site on which the school was being operated.

At that time, ICS was in financial difficulty and sought ways to finance the school's operation. After discussing the matter with Attorney Preloznik, ICS determined that the only practical means of raising the needed funds was by Indian bingo or Indian gaming. That decision was complicated by the fact that ICS had neither the funds to make the necessary investment nor the expertise to operate a gaming operation; moreover, it did not have the status of an Indian tribe qualified to take property in trust for such an operation.

The ICS board consisted of seven members, two of whom, Phil Bautista and Pat Bautista, were estranged husband and wife. Toward the end of the time period relevant to the disciplinary proceeding, Pat Bautista was removed from the board for misconduct on September 26, 1988; her husband resigned from the board on October 17, 1988.

Following the ICS board's decision to undertake a bingo operation to obtain the funds needed to continue the school's operation, Attorney Preloznik introduced the board members to Emmett Munley, a qualified bingo investor and manager in Las Vegas, whom Attorney Preloznik knew from his prior representation of the Menominee tribe. After the initial contact, Mr. Munley agreed to advance $15,000 to ICS, $5,000 of which was to go to Attorney Preloznik for legal fees. Thereafter, in March, 1986, Mr. Munley agreed to advance money to Attorney Preloznik in payment of his legal services to ICS. In return for his investment, he was to be the manager of the bingo operation being contemplated.

It was agreed that Attorney Preloznik would provide Mr. Munley with an itemized billing of his work and expenses for ICS. The agreement noted that neither ICS

nor Attorney Preloznik had the resources needed to undertake the gaming operation without assistance. Pursuant to that agreement, Mr. Munley made four $7,500 payments to Attorney Preloznik. In addition, he paid approximately $37,000 to an agency for public relations work in connection with the proposed bingo operation.[3]

In the last two billings he sent to Mr. Munley setting forth his work and expenses for ICS, Attorney Preloznik failed to include a $3,500 payment he had received from ICS on July 31, 1986 for legal fees. Attorney Preloznik's billing file disclosed two separate last pages for those two billings, one showing a credit for the $3,500 payment from ICS, the other, which was sent to Mr. Munley, omitting that credit. In any event, the last two billings sent to Mr. Munley showed totals of approximately $17,000 and approximately $20,500, each one—with or without the $3,500 credit for the ICS payment—far in excess of the $7,500 payment from Mr. Munley.[4]

---

[3]At the beginning of the disciplinary hearing, the Board dismissed the first count of professional misconduct set forth in its complaint which alleged that Attorney Preloznik acted in the presence of a conflict of interest without full disclosure and client authorization by representing ICS and, at the same time, receiving payment from Mr. Munley of his legal fees for his work at ICS and in exchange for which Mr. Munley would be given a contract to manage the bingo operation, if it were undertaken.

[4]The referee concluded that the Board failed to show by clear and satisfactory evidence that Attorney Preloznik engaged in conduct involving dishonesty, fraud, deceit or misrepresentation by failing to disclose in two of his billing statements to Mr. Munley the $3,500 in fees he had been paid by ICS or that he failed to cooperate with the Board when, in response to its request, he furnished copies of the billing statements that omitted the credit. The referee found that the record did not establish that Mr. Munley had in fact received the statements omitting the

In his attempts to further the plan to undertake a bingo operation, Attorney Preloznik dealt primarily with three members of the ICS board—Phil Bautista, Pat Bautista and Loretta Ford—who had been given full authority by the ICS board to act on its behalf in the matter. Starting in October, 1986, at Mr. Bautista's request, Attorney Preloznik began making advances of his own funds of approximately $600 per month to Mr. Bautista and $600 per month to Ms. Ford. At that time, Mr. Bautista and Ms. Ford were unemployed and were receiving public assistance. The advances, purportedly for expenses they would incur in pursuing the bingo operation, continued until December, 1987. In all, Attorney Preloznik gave each of them approximately $9,000. Also, at one point, he gave Pat Bautista, who was also unemployed and on welfare, $250 for repairs to her automobile.

In August and again in December, 1987, Attorney Preloznik had Mr. Bautista and Ms. Ford sign promissory notes reflecting the advances he had made to them. Until Mr. Bautista's resignation from the ICS board in October, 1987, the ICS board had not been informed and was unaware of those advances. Following that resignation, however, Ms. Ford told the ICS board about them, partly in response to Mr. Bautista's having made public comment about having been "bribed" by Attorney Preloznik.

Notwithstanding the promissory notes, Attorney Preloznik testified at the disciplinary hearing that he did not regard the advances as personal loans because neither Mr. Bautista nor Ms. Ford would ever be able to

---

$3,500 credit and that Attorney Preloznik's furnishing to the Board of the billing statements omitting the credit was inadvertent and subsequently corrected. The Board did not appeal from either of these conclusions.

143

repay the funds. He stated that the notes were used to protect him from having them considered his employees. He further testified that he expected to be reimbursed for the advances by ICS when funds were available from the bingo operation. All of the advances were made in cash and given to Mr. Bautista and Ms. Ford privately. Attorney Preloznik did not bill ICS for those advances he purportedly made on its behalf and when it learned of them, the ICS board ratified the advances as having been made for legitimate expenses.

In October, 1987, Attorney Preloznik, an attorney representing the Forest county Potawatomi tribe—to which the land for the bingo operation was to be given in trust by the U.S. Department of the Interior—and several ICS board members found it necessary to travel to Washington, D.C. to meet with Interior Department officials to discuss trust status. Because they lacked the funds to do so, Attorney Preloznik asked Mr. Munley for the needed money. He specified in his letter that $4,500 was for the expenses of the trip—transportation, meals, lodging, etc.—and $10,000 was for legal fees. After some hesitation, Mr. Munley sent Attorney Preloznik $15,000 to cover the legal fees and expenses of the trip.

Rather than use that $15,000 for the purposes specified, Attorney Preloznik applied it to the approximately $18,000 he had given Mr. Bautista and Ms. Ford purportedly to pay their expenses in pursuing the bingo project. Attorney Preloznik then billed the expenses for the Washington trip to ICS.

In 1988, it became apparent that Mr. Munley would have to be replaced as an investor in the proposed bingo operation. For one reason, the Department of the Interior would not approve him as an investor in an Indian gaming trust project because of his prior ties to organized crime. Further, he was either unable or unwilling to

144

provide the funds needed to complete the project. Eventually, in July, 1990 two sites were conveyed to the United States as trustee for the Forest county Potawatomi Indian tribe and the bingo operation was commenced. ICS and Mr. Munley were fully reimbursed from the profits of that operation for the amounts they had expended in pursuit of it. Mr. Munley was reimbursed for all of the monies he had provided to ICS and Attorney Preloznik in connection with the undertaking and for approximately $104,000 he had paid to his own attorney in the matter.

Also as part of his legal representation in this matter, in May, 1987, ICS paid a $10,000 brokerage commission to a corporation owned by Attorney Preloznik, a licensed real estate broker. That brokerage fee was in payment for real estate brokerage services in the sale of the property on which ICS operated the Indian school when it initially retained Attorney Preloznik and for the purchase of another site proposed for use in the bingo operation. That brokerage fee was in addition to the fees Attorney Preloznik was paid for his legal services in those transactions.

There was no written agreement for ICS to pay the brokerage commission nor was there evidence that Attorney Preloznik told the ICS board that a written fee agreement was required by law. Nevertheless, the ICS board approved the payment of that fee. In response to a request for information from the Board of Attorneys Professional Responsibility asking what legal work he had provided ICS that led to the payment of the $10,000 brokerage fee, Attorney Preloznik responded, "None."[5]

---

[5]The referee concluded that the Board failed to establish by clear and convincing evidence that Attorney Preloznik's acting on behalf of his real estate corporation at the same time he was providing legal services to ICS, his denial to the Board that he

145

We address first Attorney Preloznik's cross-appeal from the referee's conclusion that he entered into a business transaction with a client in which they had differing interests and when the client expected him to exercise his professional judgment in the transaction for its own protection without the client's consent after full disclosure, in violation of SCR 20.27(1), by making personal payments of $18,000 to two members of the ICS board without disclosing those payments to his client and obtaining its consent. In making that conclusion, the referee acknowledged that the payments appeared to have been for legitimate purposes, although the circumstances surrounding them suggested otherwise. The referee raised but did not answer several questions concerning those payments: why were they not disclosed at the time to the ICS board by any of the parties involved, why were they always made in cash delivered in an envelope by Attorney Preloznik personally to Mr. Bautista and Ms. Ford, why did Attorney Preloznik write to Mr. Munley stating, "For your information only, I have subsidized [Ms. Ford and Mr. Bautista] to the tune of $15,000."

Notwithstanding that the ICS board approved the payments after they were told of them, the referee concluded that, prior to committing it to an $18,000 obligation, Attorney Preloznik had a duty to reveal to his client the payments he was making to two of its members. In the referee's view, those payments "would well have affected [Mr. Bautista's and Ms. Ford's] judgment

---

had provided legal services in connection with the transaction that resulted in the commission to his company, his failure to advise ICS regarding a written agreement for payment of the commission and his receipt of fees as attorney and broker for the same services provided in the transactions violated the ethical rules. The Board did not appeal from that conclusion.

146

in dealing with [Attorney Preloznik] and, importantly, they were [the ICS board's] alter ego with full authority to bind it." Further, the referee considered the fact that Mr. Bautista and Ms. Ford were receiving public assistance at the time Attorney Preloznik was making the monthly payments to them as "worthy of consideration in weighing his culpability." The referee suggested that if the payments had been brought to the attention of the welfare authorities, the recipients and Attorney Preloznik might very well have been charged with conspiring to commit and perpetuate welfare fraud.

Appealing from the referee's conclusion, Attorney Preloznik attempted to establish that the payments did not constitute the kind of business transaction proscribed by SCR 22.27(1). The basis of his argument is that the lack of any expectation of an ability on the part of either Mr. Bautista or Ms. Ford to repay the advances prevented them from qualifying as a "business transaction." That argument has no merit. Attorney Preloznik used his own money to enable two members of his client's board of directors to pursue a gaming operation which, if successful, would redound to the benefit not only of his client but also of himself as his client's attorney. Making those payments without his client's knowledge and consent violated SCR 22.27(1).

Likewise meritless are Attorney Preloznik's other assertions in support of his position: that the Board failed to prove that ICS expected Attorney Preloznik to exercise independent professional judgment for its protection, that the payments were not disclosed to the ICS board because Mr. Bautista and Ms. Ford had full authority to act for it, that the payments were always made in cash because neither Ms. Ford nor Mr. Bautista had regular banks, which would have made it difficult for them to cash checks, and that he disclosed the fact of the

147

payments to Mr. Munley for "[his] information only" because he did not want it to be made public and he considered it a confidential matter with his client. Contrary to the latter assertion, Attorney Preloznik did not tell his client of the fact of those payments; the client learned of them only when one of the recipients found it appropriate to disclose them after the other recipient had spoken out about them.

We also reject Attorney Preloznik's argument that his violation of any duty he might have had to reveal the payments to the ICS board was minimized by the fact that, when he made those payments, the ICS board did not have the funds to make them or to repay him for them. We agree, however, that it is significant that after it learned of the payments, the ICS board approved them as payment of legitimate expenses of its undertaking.

As the Board asserted in its brief, by making payments of his own funds to two members of the ICS board without his client's knowledge, Attorney Preloznik created a situation in which he had interests differing from those of his client and thereby compromised his ability to exercise independent professional judgment for his client's protection. The facts that Mr. Bautista and Ms. Ford each testified that Attorney Preloznik neither asked for nor received any special favors and that Mr. Bautista testified that the payments did not influence his judgment in respect to Attorney Preloznik's representation of ICS mitigate the seriousness of the professional misconduct but do not render it innocuous.

We turn now to the Board's appeal from the referee's conclusion that Attorney Preloznik did not engage in dishonesty, fraud, deceit or misrepresentation by using the $15,000 he obtained from Mr. Munley ostensibly for payment of his fees and the expenses of the Washington trip to reimburse himself for the payments

148

he had made to Mr. Bautista and Ms. Ford.[6] The Board inferred that the referee's conclusion in respect to this count of alleged misconduct was based on his having considered that the monies advanced by Mr. Munley were eventually refunded to him after the bingo operation got underway and that the ICS board did not dispute the propriety of the payments Attorney Preloznik had made to Mr. Bautista and Ms. Ford but acknowledged that they had been made for legitimate expenses in pursuing the bingo operation. We agree that restitution does not render an attorney's misconduct unsanctionable but may mitigate the seriousness of discipline to be imposed. Nevertheless, the Board's inference does not appear warranted by the referee's statement of his conclusion that it failed to establish misconduct by clear and convincing evidence.

In this regard, the referee found that in response to Attorney Preloznik's letter requesting $14,525 for the trip to Washington, D.C. for ICS officers and directors and Attorney Preloznik, Mr. Munley sent Attorney Preloznik a check for $15,000 labeled "Milwaukee Project." The referee's findings that Mr. Munley was ultimately reimbursed for all of the payments he had made in furtherance of the ICS venture and that the ICS board ultimately ratified the payments to which Attorney Preloznik applied Mr. Munley's funds as legitimate expenses support an inference that the referee concluded that there was no professional misconduct here because the Board failed to establish that Attorney Preloznik was not entitled to apply Mr. Munley's money to the general expenses of ICS but was required to apply them specifically to the payment of the Washington trip.

---

[6]The record discloses that Attorney Preloznik applied the $15,000 to the $18,000 in payments he had made and wrote off the $3,000 balance.

149

In support of its position, the Board pointed out that Attorney Preloznik did not inform the ICS board of his request to Mr. Munley for the funds for the Washington trip nor of his receipt of the $15,000 and his use of it to reimburse himself for the payments he had made to Ms. Ford and Mr. Bautista. Yet, that fact equally supports Attorney Preloznik's position that the money he received from Mr. Munley, although obtained with the Washington trip in mind, was properly available for the payment of any of ICS's expenses in pursuing the bingo operation (the "Milwaukee Project"). It would also explain why Attorney Preloznik subsequently asserted that he had paid the expenses of the Washington trip himself and then billed ICS for those expenses.

We adopt the referee's conclusion that Attorney Preloznik did not engage in professional misconduct by his application of the $15,000 he obtained from Mr. Munley.

On the issue of discipline to be imposed for Attorney Preloznik's misconduct in making payments of his own funds in the amount of $18,000 to two members of the ICS board without the board's knowledge and consent, the Board argued that a 90-day license suspension is appropriate, whether or not the court also determined that his application of Mr. Munley's $15,000 to reimburse himself for those payments constituted professional misconduct. We disagree. The seriousness of that misconduct is mitigated by the fact that the ICS board promptly ratified those payments upon becoming aware of them. We determine that a public reprimand is discipline proportionate to the seriousness of the misconduct in this case.

While the referee recommended that Attorney Preloznik be required to pay less than the full costs of the disciplinary proceeding, we determine that, with the

exception of the costs incurred by the Board in the appeal and cross-appeal from the referee's report and recommendation, the circumstances before us do not warrant departure from the court's practice of assessing full costs of a disciplinary proceeding against an attorney found to have engaged in professional misconduct, albeit to a lesser extent than the Board had alleged. Contrary to Attorney Preloznik's argument, the referee did not characterize the counts of professional misconduct on which the Board was unsuccessful as "clearly frivolous." We also reject Attorney Preloznik's objection to the costs attributable to witness fees and expenses for the appearance of Mr. Munley to testify at the disciplinary hearing.

In regard to the costs incurred by the Board in its appeal and in Attorney Preloznik's cross-appeal, the Board had submitted a supplemental statement of costs setting forth fees of its counsel and disbursements in the appeal in the amount of $1,956.70. Attorney Preloznik filed an objection to those costs, taking the position that he should not be assessed the full amount of the costs unless the Board prevails on its appeal as well as in its opposition to his cross-appeal. The Board agreed with Attorney Preloznik that if it prevails only in its appeal or in opposing the cross-appeal, the court should assess one-half of the costs incurred in the appeal and cross-appeal. The Board explicitly based its agreement on the fact that its counsel fees were allocated nearly equally between the preparation of its appellate brief and in preparation of its response to the brief in the cross-appeal. We accept the Board's position on costs incurred in this appeal and cross-appeal and, accordingly, assess one-half of those costs against Attorney Preloznik.

IT IS ORDERED that Attorney Joseph F. Preloznik is publicly reprimanded for his professional misconduct determined in this proceeding.

IT IS FURTHER ORDERED that within 60 days of the date of this order Joseph F. Preloznik pay to the Board of Attorneys Professional Responsibility the costs of this disciplinary proceeding as provided herein, provided that if the costs are not paid within the time specified and absent a showing to this court of his inability to pay the costs within that time, the license of Joseph F. Preloznik to practice law in Wisconsin shall be suspended until further order of the court.

HEFFERNAN, C.J. and ABRAHAMSON, J., took no part.

LOUIS J. CECI, J. *(dissenting)*. In addition to the professional misconduct the referee concluded that Attorney Preloznik had engaged in, I would conclude that he also engaged in professional misconduct by applying the funds he obtained for travel and other expenses for a trip on behalf of his client to reimburse himself for the payments of his own funds he had improperly made to two members of his client's board of directors. Attorney Preloznik's conduct in this matter was reprehensible and approached fraud. I would suspend his license to practice law for six months.